IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| KIMBERLIN NICOLE GALLEGOS, Personal Representative of the Estate of Nathaniel Adam Stotts,<br><br>Plaintiff,<br><br>v.<br><br>MARY LANNING MEMORIAL HOSPITAL ASSOCIATION and BRENT HOOD, D.O.,<br><br>Defendants. | 8:18CV269<br><br>**MEMORANDUM AND ORDER** |

Pending before the Court are several joint motions (Filing Nos. 70, 73, and 82) filed by defendants Mary Lanning Memorial Hospital Association ("hospital") and Brent Hood, D.O. ("Dr. Hood" and collectively, "defendants"), including the defendants' (1) "Joint Motion to Strike Testimony of Dr. David Rosenbaum" ("Dr. Rosenbaum"); (2) "Joint Motion to Exclude Expert Testimony of James E. Kemmler, M.D., [("Dr. Kemmler")] and Motion for Summary Judgment"; and (3) "Joint Motion to Strike Unsworn Opinion Letter of" Dr. Kemmler. Plaintiff Kimberlin Nicole Gallegos ("Gallegos"), as the personal representative of the estate of Nathaniel Adam Stotts ("Stotts"), resists these motions. For the reasons stated below, the first two motions will be granted, and the third will be denied.

I. **BACKGROUND**

A. **Stotts**

Stotts, a twenty-three-year old man, died on July 12, 2016, after suffering deep-venous thrombosis of the left leg and a pulmonary thromboembolism ("DVT/PE") following surgery on his left foot.

Before Stotts's death, he and Gallegos were engaged to marry. Gallegos is also the mother of Stotts's son, who was born after Stotts died. Stotts held a general education

diploma ("GED") and completed three semesters at a community college studying diesel technology. Although he did not complete that program due to mental-health issues which resulted in five psychiatric hospitalizations, he hoped to return to the program one day.

After college, Stotts worked at numerous places, but none for longer than a week until he started to work at Pizza Hut. From June 2015 until June 2016, Stotts, who did not have a driver's license, worked as a dishwasher at Pizza Hut, earning nine dollars per hour and working on average less than ten hours per week. Stotts could not work more hours due to "scheduling issues" with coworkers. Stotts planned to return to Pizza Hut three months after surgery and to request more hours. Due to Stotts's limited income, Gallegos largely provided for him.

Stotts, who was six feet and five inches tall and weighed four-hundred pounds, smoked a pack of cigarettes a day. He spent a lot of time playing video games. Stotts also had prior criminal convictions for criminal mischief and possessing less than one ounce of marijuana.

B.   **The Surgery**

On May 31, 2016, Stotts saw Dr. Hood for pain in his left foot. Dr. Hood ordered an X-Ray and an MRI. On June 3, 2016, Stotts followed up with Dr. Hood who determined, upon reviewing the test results, that Stotts had a Lisfranc injury on his left foot. Dr. Hood recommended surgery to repair Stotts's foot and discussed risk factors such as the need "to place [Stotts] at least on aspirin for [DVT/PE] prophylaxis." On June 14, 2016, the hospital admitted Stotts for surgery with Dr. Hood.

After surgery, Dr. Hood documented in his notes that Stotts would "be non-weightbearing" on his left leg for three months and would start on aspirin as a DVT/PE prophylaxis as well as "mechanical prophylaxis." Dr. Hood further noted Stotts faced a

heightened risk for DVT/PE due to risk factors such as "morbid obesity" and understood the risks after discussing them with Dr. Hood.

The hospital discharged Stotts the next day with instructions to take gabapentin and oxycodone. In her deposition, Gallegos, who was with Stotts when the hospital discharged him, testified that no one told Stotts to take aspirin.

On June 29, 2016, Stotts saw Dr. Hood for a two-week, post-operative follow-up. Dr. Hood and his staff reviewed the medication Stotts was taking which included only gabapentin and oxycodone. Dr. Hood also noted Stotts used a wheelchair for mobility, despite having a walker available. Dr. Hood told Stotts to remain non-weightbearing for another four weeks but did not discuss aspirin or any other DVT/PE prophylaxis therapy. Dr. Hood did tell Stotts to be as active as possible.

From the date of surgery until his death, Stotts remained inactive because his walker could not support him. He continued to "s[i]t around and play[] video games" and smoke, despite Dr. Hood's request that Stotts stop smoking because it could inhibit healing.

Gallegos found Stotts deceased at his residence thirteen days after his two-week follow up. A postmortem toxicology report showed Stotts had no aspirin or any other medication for DVT/PE prophylaxis in his system.

C.   **This Lawsuit**

On June 14, 2018, Gallegos sued the defendants[1] alleging (1) the hospital was negligent in failing to properly "follow" and "communicate" Dr. Hood's medication orders and (2) Dr. Hood was negligent for failing to properly prescribe, communicate, and follow

---

[1]Gallegos also sued Hastings Orthopaedic & Sports Medicine Specialists, but the parties jointly stipulated to dismiss it from this action (Filing No. 30).

through on medications for DVT/PE prophylaxis and communicate with and examine Stotts at his two-week follow-up. Gallegos alleges Stotts died as a direct and proximate result of the defendants' negligence. She asserts three claims: (1) a survival claim for Stotts' pain and suffering before death, (2) a wrongful-death claim, and (3) a claim for funeral and burial expenses.

### D. The Experts

To support her claims, Gallegos retained two experts relevant to the present motions—Dr. Rosenbaum and Dr. Kemmler.

Gallegos hired Dr. Rosenbaum, an economist, to testify as to Stotts's future economic losses. Dr. Rosenbaum issued a report (Filing No. 71-4), in which he calculated "the expected earnings from age 25 to age 67 of a white male with a GED working full time, year round." Dr. Rosenbaum noted he relied on "[t]he publication <u>Full-Time Earnings in the United States, 2017 Edition</u>" ("earnings publication") which "shows full-time, year-round earnings for individuals in a variety of demographic groupings." Based solely on the earnings publication's data and after applying inflation, Dr. Rosenbaum determined such a male would earn $1,897,578.

Gallegos hired Dr. Kemmler, a board-certified orthopedic surgeon, to testify about the defendants' standard of care and Stotts's cause of death. On September 15, 2019, Dr. Kemmler issued an opinion letter (Filing No. 87 (sworn)) where he concluded "the standard of care was breached" in this case ("opinion letter"). Dr. Kemmler opined Stotts died from DVT/PE which developed as a result of (1) Stotts's "lower extremity injury and co-morbid high risk" factors, such as morbid obesity and smoking, and (2) "lack of follow through of standard of care in ensuring appropriate DVT/PE prophylaxis therapy."

On December 2, 2019, counsel for the defendants deposed Dr. Kemmler. At his deposition, Dr. Kemmler could neither say whether aspirin or any other DVT/PE

prophylaxis would have prevented the DVT/PE that caused Stotts's death nor quantify how much the risk of DVT/PE increased by not taking those precautions. Recognizing Stotts already faced an increased risk of DVT/PE due to the location of his injury, his morbid obesity, and his smoking habit, Dr. Kemmler could only testify the DVT/PE prophylaxis would have "decreased" the risk by an unknown amount.

### E. The Present Motions

The defendants now move to exclude under Federal Rules of Evidence 401, 402, and 702 both Dr. Rosenbaum's and Dr. Kemmler's respective testimony. Regarding Dr. Rosenbaum, the defendants contend his opinion and conclusions are unreasonable and unreliable for failing to consider critical evidence.

As for Dr. Kemmler, the defendants urge the Court to strike Dr. Kemmler's opinion letter because Gallegos did not authenticate the opinion letter with an affidavit until after the deadline had passed. In the defendants' view, absent that authentication the opinion letter is inadmissible hearsay evidence. *See* Fed. R. Evid. 801 and 802.

With respect to Dr. Kemmler's testimony itself, the defendants argue his "proffered opinion on causation is insufficiently definite to establish causation." The defendants assert that without Dr. Kemmler's testimony, Gallegos cannot establish essential elements of her claims, entitling them to summary judgment in their favor.

## II.     DISCUSSION

### A.     Standard for Expert Testimony

The parties agree Nebraska substantive law governs this diversity action[2] and the Federal Rules of Evidence govern the admissibility of evidence. *See Erie RR. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

Rule 702 provides that a qualified expert may testify if (1) their "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based upon sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert has reliably applied the principles and methods to the facts of the case." Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), and its progeny, the Court serves as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."

"To satisfy the relevance requirement, the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue." *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010). "Although the factual basis of an expert's opinion is generally an issue of credibility rather than admissibility, an expert's opinion should be excluded if it 'is so fundamentally unsupported that it can offer no assistance to the jury.'" *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 865 (8th Cir. 2010) (quoting *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001)). Even if an expert meets certain *Daubert* factors, the Court should still exclude that expert's opinion "if it does not apply to the specific facts of the case." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000).

---

[2]Gallegos is a Texas citizen, the hospital and Dr. Hood are Nebraska citizens, and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a).

### B. Dr. Rosenbaum

Dr. Rosenbaum prepared a report projecting Stotts's lost future earnings. The defendants request the Court exclude Dr. Rosenbaum's opinions and conclusions because they are "not at all related to the actual facts" in this case.

Specifically, the defendants assert that Dr. Rosenbaum based his report on the expected earnings "from age 25 to age 67 of a white male with a GED working full time, year round" despite the fact that Stotts never worked fulltime in his life. As a result, the defendants contend Dr. Rosenbaum failed "to consider the applicable critical evidence" and his opinion "would result in the jury speculating as to any potential future damages." The Court agrees.

Under Nebraska law, "[a] plaintiff's evidence of damages may not be speculative or conjectural and must provide a reasonably certain basis for calculating damages." *Shipler v. Gen. Motors Corp.*, 710 N.W.2d 807, 839 (Neb. 2006).

Dr. Rosenbaum's opinion is inconsistent with this standard because he failed to account for numerous important facts. As highlighted by the defendants, Dr. Rosenbaum did not consider Stotts's (1) work history, including that he never worked fulltime (or at any job longer than one week other than Pizza Hut), (2) lack of a driver's license, (3) mental-health issues, and (4) criminal history. Instead, Dr. Rosenbaum offered a generic income projection based on the earnings publication.

To illustrate the disconnect between Dr. Rosenbaum's report and the facts in this case, Stotts made a total gross income of $3,816.40 in the year he worked at Pizza Hut (which amounts to approximately eight hours per week). In contrast, Dr. Rosenbaum projected Stotts would make $31,871 in a year working fulltime at age 25. Dr. Rosenbaum did not explain or offer any basis to substantiate his assumption that Stotts's employment pattern would so drastically change.

Gallegos argues the Court should nonetheless allow Dr. Rosenbaum's opinion because Dr. Rosenbaum also did not consider certain facts which would actually increase Stotts's earning potential, such as his three semesters at community college. But this only further shows how disconnected Dr. Rosenbaum's calculations are from the facts of this case.

Under these circumstances, Dr. Rosenbaum's opinion does not apply "principles and methods . . . to the specific facts of this case," *United States v. Coutentos*, 651 F.3d 809, 820 (8th Cir. 2011), and his report "contain[s] speculative calculations," *Cole*, 599 F.3d at 865. His opinion, based on unsubstantiated assumptions, would provide "little to no assistance to the jury." *Id.* Accordingly, the Court finds Dr. Rosenbaum's opinion is "so fundamentally unsupported that it" must be excluded. *Lawrey v. Good Samaritan Hosp.*, 751 F.3d 947, 952-53 (8th Cir. 2014) (affirming the district court's exclusion of an expert opinion that "did not fit the specific facts" of the case); *see also Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 415-16 (8th Cir. 2005) (same for an expert opinion based on invalid assumptions).

### C. Dr. Kemmler

Gallegos intends to have Dr. Kemmler testify on the defendants' standard of care and Stotts's cause of death. The defendants request the Court exclude Dr. Kemmler's testimony.

To resolve this matter, the Court must first decide what evidence it will consider. The defendants request the Court strike and disregard Dr. Kemmler's opinion letter because it is supported only by a belated, "sham" affidavit (Filing No. 87). *See Schiernbeck v. Davis*, 143 F.3d 434, 438 (8th Cir. 1998) (discussing sham-affidavit rule). The Court will consider the opinion letter, however, because even with that letter, the Court must exclude Dr. Kemmler's testimony. The defendants' motion to strike the opinion letter is denied.

Looking to Dr. Kemmler's opinion, the defendants contend his opinion is inadmissible under Rules 401, 402, and 702 because "it is insufficiently definite to establish causation and thus speculative, unhelpful to the trier of fact, and irrelevant." More specifically, the defendants characterize Dr. Kemmler's opinion as supporting only a "loss-of-chance" theory, which is not recognized under Nebraska law and therefore irrelevant. The defendants' argument is compelling.

To establish a prima facie case of medical malpractice under Nebraska law, "a plaintiff must show (1) the applicable standard of care, (2) that the defendant(s) deviated from that standard of care, and (3) that this deviation was the proximate cause of the plaintiff's harm." *Hemsley v. Langdon*, 909 N.W.2d 59, 66 (Neb. 2018). A proximate cause is one that "produces a result in a natural and continuous sequence and without which the result would not have occurred." *Ewers v. Saunders Cty.*, 906 N.W.2d 653, 663 (Neb. 2018). In other words, "[a] defendant's conduct is a proximate cause of an event if the event would not have occurred but for that conduct, but it is not a proximate cause if the event would have occurred without that conduct." *Id.*

"[I]n medical malpractice cases, expert testimony by a medical professional is normally required to establish causation and the standard of care under the circumstances." *Simon v. Drake*, 829 N.W.2d 686, 693 (Neb. 2013); *see also* Neb. Rev. Stat. § 44-2810 (defining standard of care under the Nebraska Hospital-Medical Liability Act as that which health-care providers in the same community would normally exercise). A plaintiff need not present expert testimony, however, in cases where a layman could presumably recognize and comprehend the alleged negligence under the "common-knowledge exception." *Thone v. Reg'l W. Med. Ctr.*, 745 N.W.2d 898, 904 (Neb. 2008). This exception only applies in "cases of extreme and obvious misconduct," such as where a doctor amputates the wrong limb. *Id.*

9

"Opinions dealing with proximate causation in a medical malpractice action are required to be given in terms that express a probability greater than 50 percent." *Walton v. Patil*, 783 N.W.2d 438, 447 (Neb. 2010); *see also Steinke v. Shared Health Plan of Neb., Inc.*, 518 N.W.2d 904, 907 (Neb. 1994) ("Medical opinions must be based on reasonable medical certainty."). Although a forty-nine percent chance "of a better recovery may be medically significant, it does not meet the legal requirements for proof of causation." *Walton*, 783 N.W.2d at 447. Therefore, "[m]edical testimony couched in terms of 'possibility' is insufficient to support a causal relationship." *Steinke*, 518 N.W.2d at 907-08.

With that, Nebraska law also does not recognize the "loss-of-chance" doctrine. *See Rankin v. Stetson*, 749 N.W.2d 460, 469 (Neb. 2008). Under that doctrine, a plaintiff may recover against a doctor for medical malpractice that does not result in a particular injury but decreases the chance of surviving or, in other words, results in a "diminished likelihood of achieving a more favorable medical outcome." *Cohan v. Med. Imaging Consultants, P.C.*, 900 N.W.2d 732, 740 (Neb. 2017); *see also Loss-of-Chance Doctrine*, Black's Law Dictionary (11th ed. 2019). Under Nebraska law, an opinion that a doctor "decreased [a patient's] chances of a better outcome" is inadequate if the expert cannot state it is more likely than not that without the doctor's error the plaintiff would have had a better recovery. *Walton*, 783 N.W.2d at 447. Such opinions express only "a loss of chance, not the probability of a different outcome." *Id.*

Here, Dr. Kemmler stated in his opinion letter

> that the standard of care was breached in regard to lack of follow through with plan and appropriate treatment for DVT/PE prophylaxis in this high-risk patient. The patient's ultimate demise was that of DVT/PE . . . . This patient's demise was a direct and proximate result of the DVT/PE, which developed as a result of the patient's lower extremity injury and co-morbid high risk and as a direct and proximate result of the lack of follow through of standard of care in ensuring appropriate DVT/PE prophylaxis therapy.

10

When deposed, Dr. Kemmler stated DVT/PE occurs "probably" in less than one percent of foot and ankle surgeries without comorbidities. Dr. Kemmler could not quantify how much more likely it is DVT/PE will occur in cases with comorbidities, but said morbid obesity, smoking, and immobility increase the risk.

Dr. Kemmler further testified that, in Stotts's case, "[e]ven with [DVT/PE] prophylaxis, based on the procedure, other comorbidities, et cetera," aspirin would have made "a reduction in the risk, . . . [but] not necessarily guaranteed prevention." Dr. Kemmler could not quantify how much such prophylaxis therapy would have reduced Stotts's risk but could only state that without aspirin, Stotts "increased his risk of suffering" DVT/PE to an unknown degree.

Counsel then quoted the excerpt from Dr. Kemmler's opinion letter recited above and asked Dr. Kemmler to explain what it meant. Dr. Kemmler once again stated, "There would have been a better chance of not having [DVT/PE] at all" if there would have been "follow through" in DVT/PE prophylaxis therapy. Counsel then asked, "But you still can't say it was more likely than not, if [Stotts] was given aspirin at the two-week postoperative period . . . he would not have had the [DVT/PE] or died from the [DVT/PE]; is that correct?" Dr. Kemmler responded, "that would be correct" and also confirmed the same would be true with aspirin from the date of surgery or discharge from the hospital.

In short, Dr. Kemmler could not express a probability greater than fifty percent that DVT/PE prophylaxis therapy would have prevented Stotts from developing the fatal DVT/PE. *Id.* at 447. Dr. Kemmler instead opined that failing to provide DVT/PE prophylaxis therapy "diminished Stotts's likelihood of achieving a more favorable medical outcome" but, despite repeated inquiries, simply could not quantify to what extent. This opinion does not "meet the legal requirements for proof of causation," *id.*, and instead supports recovery only under the "loss-of-chance" doctrine not recognized under Nebraska law, *see Rankin*, 749 N.W.2d at 469.

In an attempt to rescue Dr. Kemmler's testimony, Gallegos focuses solely on Dr. Kemmler's statement in his opinion letter that Stotts's DVT/PE developed "as a result of the patient's lower extremity injury and co-morbid high risk and as a direct and proximate result of the lack of follow through of standard of care in ensuring appropriate DVT/PE prophylaxis therapy." This lone statement, when coupled with Dr. Kemmler's deposition testimony, is inadequate.

The Nebraska Supreme Court considered a similar situation in *Walton*, 783 N.W.2d at 446-47. There, an expert provided a report that stated a doctor's "deviation from the standard of care caused 'harm'" to his patient, "but the precise nature of that harm [was] not readily apparent from the report." *Id.* At his deposition, the expert explained that, although he could not "say with certainty," he "thought [the patient] would have had a better chance" absent the doctor's deviation. *Id.*

The Nebraska Supreme Court determined the expert's deposition testimony simply elaborated on and identified more specifically the "harm" discussed in his report. *Id.* Because his subsequent deposition testimony made "clear that he was referring only to a loss of chance," his opinion was insufficient to establish causation even with his report. *Id.*

Here, like in *Walton*, Dr. Kemmler's conclusion did not change from his opinion letter to his deposition. Dr. Kemmler simply elaborated on his opinion during his deposition. Dr. Kemmler apparently cannot state that if Stotts had taken aspirin or received other DVT/PE prophylaxis therapy it is more likely than not he would not have suffered the DVT/PE or died. *See Cohan*, 900 N.W.2d at 740. His testimony is inadequate under Nebraska law to show causation, and therefore, the Court will exclude it. *See Walton*, 783 N.W.3d at 447; *see also* Fed. R. Evid. 401, 402, and 702.

### D. Summary Judgment

The defendants contend the Court should grant summary judgment in their favor because, without Dr. Kemmler's testimony, Gallegos cannot make a sufficient showing on all the essential elements of her claims.

The Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a summary judgment motion, the Court views the facts "in the light most favorable to the non-moving party" and must "not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018) (quoting *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996)).

"Although the burden of demonstrating the absence of any genuine issue of material fact rests on the movant, a nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Nationwide Prop. & Cas. Ins. Co. v. Faircloth*, 845 F.3d 378, 382 (8th Cir. 2016) (quoting *Rohr v. Reliance Bank*, 826 F.3d 1046, 1052 (8th Cir. 2016)).

"A principal purpose of the summary-judgment procedure 'is to isolate and dispose of factually unsupported claims or defenses.'" *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Therefore, "[s]ummary judgment is mandated 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Iowa Great Lakes Sanitary Dist. v. Travelers Cas. & Sur. Co.*, 913 F.3d 760, 763 (8th Cir. 2019) (quoting *Celotex*, 477 U.S. at 322).

Here, absent Dr. Kemmler's testimony, Gallegos has presented no evidence on the element of causation. Gallegos has identified no other qualified expert to testify on causation. *See Simon*, 829 N.W.2d at 693 (explaining that "expert testimony by a medical professional is normally required to establish causation and the standard of care" in medical malpractice cases). And this is not the rare case where a layperson could readily identify obvious negligence. *See Thone*, 745 N.W.2d at 904.

Causation is an essential element to Gallegos's case. *See Hemsley*, 909 N.W.2d at 66 (including causation as part of a prima facie case of medical malpractice). Because Gallegos has not made a sufficient showing on that element, the Court must grant the defendants' motion for summary judgment. *Iowa Great Lakes Sanitary Dist.*, 913 F.3d at 763 (quoting *Celotex*, 477 U.S. at 322).

Based on the foregoing,

IT IS ORDERED:
1. Defendants Mary Lanning Memorial Hospital Association and Brent Hood, D.O.'s Joint Motion to Strike Testimony of Dr. David Rosenbaum (Filing No. 70) is granted.
2. The defendants' Joint Motion to Exclude Expert Testimony of James E. Kemmler, M.D., and Motion for Summary Judgment (Filing No. 73) is granted.
3. The defendants' Joint Motion to Strike Unsworn Opinion Letter of James E. Kemmler, M.D. (Filing No. 82) is denied.
4. A separate judgment will issue.

Dated this 2nd day of April 2020.

BY THE COURT:

Robert F. Rossiter, Jr.
United States District Judge